**Oscar BORIA, Petitioner–Appellant,**

v.

**John KEANE, Superintendent, Sing Sing Correctional Facility, Respondent–Appellee.**

**No. 1332, Docket 95–2688.**

United States Court of Appeals, Second Circuit.

Argued March 29, 1996.

Decided May 3, 1996.

---

**1.** We reject as unworthy of discussion FHLMC's void for vagueness argument based on the Due

Process Clause.

**50**

Robert N. Isseks, Middletown, NY, for petitioner-appellant.

Francis D. Phillips, II, Goshen, NY, for respondent-appellee.

Before: OAKES and PARKER, Circuit Judges, and KNAPP, Senior District Judge.*

WHITMAN KNAPP, Senior District Judge:

The petitioner is now—and for about six years has been—serving a twenty year to life sentence resulting from a "buy and bust" arrest for having sold four plastic bags of cocaine to an informer. This was petitioner's first contact with the criminal law. Upon this appeal, he does not challenge the propriety of the trial leading to his conviction. Rather, he asserts that he was deprived of constitutionally adequate representation by counsel when the People offered him a plea bargain which would have resulted in a one to three year sentence, and his attorney allowed him to reject such offer without giving him any advice as to the wisdom of so doing.

This argument was first presented to and rejected by the judge who had presided over the trial. The trial judge's rejection was affirmed by the Appellate Division of the New York Supreme Court, and leave to appeal to the Court of Appeals was denied. Petitioner renewed the claim in the instant Habeas Corpus proceeding, where it was rejected by the District Court in a carefully considered opinion. This appeal followed.

## BACKGROUND [1]

Petitioner was arrested on May 13, 1988, and eleven days later was indicted for a Class A–II felony. Upon arraignment, being represented by one Thomas Murphy, Esq., he pleaded not guilty. On June 10, petitioner's father retained Gary Greenwald, Esq. to represent his son, making an "up front" payment of $8,000.[2] Some time between July 25 and August 10, the District Attorney advised Greenwald that the People were willing to accept a plea of guilty under circumstances which would result in a sentence of 1 to 3 years; but warned that should such offer be rejected, there would be filed a superseding indictment for a Class A–I felony which, pursuant to the "Rockefeller Laws," would make that or any similar plea impossible.

On August 10, Greenwald advised the court that the petitioner rejected the offer. The District Attorney then put on the record

* Honorable Whitman Knapp of the United States District Court for the Southern District of New York, sitting by designation.

1. As the state court finders of fact may have rejected parts or even all of petitioner's testimony, this statement will be based exclusively on matters of record and the testimony of the attorney claimed to have rendered constitutionally ineffective representation.

2. The formal retainer agreement executed by petitioner on or about June 10 provided: "I ... do hereby agree to retain the law office of Greenwald, Graubard & Cohen on the matter pending before Goshen County Court. The legal fees exclusive of hearings and trials shall be a minimum of $10,000 and a maximum of $20,000. The retainer does not apply to any form of appeals." (H.36–37).

the warning he had previously given Greenwald about the consequences of rejection; and on the following day sent Greenwald a formal notice that the matter was to be presented to a Grand Jury. The threatened indictment was not returned until September 20, 1988. Petitioner was ultimately convicted, and on January 4, 1990, began to serve his sentence.

In 1992, petitioner, represented by a different attorney, moved the trial judge for an order vacating the judgment of conviction on the ground, among others, of constitutionally inadequate representation by counsel. A hearing on such motion, among others, began on February 26 and concluded on March 6.

Greenwald testified at great length at the hearing. He testified that he did not recall any conversation with the District Attorney or anyone in the District Attorney's office regarding the case before August 10. Nothing in his testimony suggests that he had any contact with the District Attorney's office between August 10 and September 20. Indeed, he testified that he could not recall with certainty the name of any assistant district attorney with whom he might at any time have spoken regarding this case. He had at all times exclusively relied on the petitioner for any and all information about the case.

Just before the trial began, Greenwald sought a ruling suppressing two ruinous statements petitioner had made after his arrest. He told the trial judge:

> had the attorney for the Defendant been aware of the existence of and the prosecu-

tor's intent to use those statements for any purpose whatsoever during the course of trial then his advise to the Defendant, relative to accepting or to rejecting the proffered offer of a plea to a B felony, may well have been different.

Greenwald Affirmation, 9/25/89.[3]

However, time and again, and in many forms, Greenwald made clear that he had not in any way or at any time discussed with the petitioner the advisability of accepting or rejecting the offered plea. He testified that, after advising petitioner that a rejection of the plea would be final in the sense that the expected superseding indictment would eliminate all possibility of a minimal sentence, he kept discussing with petitioner strategies he planned to follow in defending against the new indictment.

His testimony made clear that, although he never even suggested such a thought to petitioner, it was his own view that his client's decision to reject the plea bargain was suicidal.[4] He sought to justify his conduct by asserting that he was certain that the petitioner would never admit his guilt or accept a plea. He said he had been confirmed in this certainty by the petitioner's repeated assertion that accepting a plea would embarrass him in front of his children. For example, Greenwald testified: "He would be very upset about the plea. He was upset about how he was embarrassed in front of his children. And he would bring up the subject in a context often about his upset about his children." (H. at 18).

---

**3.** New York Criminal Procedure Law provides that upon demand of a defendant, the prosecutor has a duty to disclose "any written, recorded or oral statement of the defendant ... made, other than in the course of the criminal transaction, to a public servant engaged in law enforcement activity or to a person then acting under his direction or in cooperation with him." N.Y.Crim. Proc. Law § 240.20(1)(a)(McKinney 1993). Greenwald swore in his affidavit of September 25, 1989, offered in support of his motion to suppress the statements, that "the prosecutor had ... [falsely] informed the Defendant and this Court, that no such statements existed."

**4.** For example, at the hearing, Greenwald testified: "on June 10th, 1988 [the day Greenwald was retained], it would have been my position

and my belief that relative to criminal cases that a drug case under circumstances of a possession or direct sale to an undercover agent is probably one of the most difficult cases to defend and, secondly, sir, in relationship to the hate, *which I often tell drug defendants*, that most people who sit on the jury have never seen drugs before such as cocaine ... and [the jurors] generally are very prejudicial because peoples' views are very anti-drugs and, therefore, it is difficult and it's often difficult to get an unbiased jury in that regard." H. at 44 (emphasis supplied). He also testified that he had told the judge at sentencing that the court could "take judicial notice" that getting an acquittal in a drug case in upstate New York was almost impossible. *Id.*

Greenwald admitted that he had been aware that his client—like any other person—was capable of *changing his mind.*[5] Yet he did nothing to persuade either his client or the father by whom he had been retained of the absurdity of a decision to risk years of prison separation from his family to avoid a few hours of embarrassment "in front of his children."

## DISCUSSION

Several questions are presented by the foregoing facts:

1. Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)(hereinafter "*Strickland*"), do the facts establish that Greenwald's conduct did indeed fall short of constitutionally required assistance?

2. Also under *Strickland,* can it be said that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"?

3. What is the impact upon this case of *Strickland*'s "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance?"

4. Are we precluded from considering these questions by any factual finding that may have been made by a New York State court?

We shall consider each of these questions in turn.

■ First, to show *Strickland* ineffectiveness it must appear that, under the totality of circumstances, Greenwald failed to exercise the skills and *diligence* that a reasonably competent attorney would provide under similar circumstances. 466 U.S. at 688, 104 S.Ct. at 2064–65. There seems to be no Second Circuit decision dealing with the precise question of a criminal defense lawyer's duty when a defendant's best inter-

ests clearly require that a proffered plea bargain be accepted, but the defendant, professing innocence, refuses to consider the matter. This lack of specific decision undoubtedly arises from the circumstance that such duty is so well understood by lawyers practicing in this Circuit that the question has never been litigated.

While the Second Circuit may not have spoken, the *Strickland* Court has indicated how the question should be resolved. Just before starting its discussion of the merits, it observed that it had "granted certiorari to consider the standards by which to judge a contention that the Constitution requires that a criminal judgment be overturned because of the actual ineffective assistance of counsel." 466 U.S. at 684, 104 S.Ct. at 2063. Later it pointed to "[p]revailing norms of practice as reflected in American Bar Association standards" as guides "to determining what is reasonable." *Id.* at 688, 104 S.Ct. at 2065.

The American Bar Association's standard on the precise question before us is simply stated in its Model Code of Professional Responsibility, Ethical Consideration 7–7 (1992):

A defense lawyer in a criminal case has the duty to advise his client fully on *whether a particular plea to a charge appears to be desirable.* (emphasis added)

Anthony G. Amsterdam, in *Trial Manual 5 for the Defense of Criminal Cases* (1988), discusses the question in more detail:

The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in any criminal case. This decision must ultimately be left to the client's wishes. Counsel cannot plead a client guilty, or not guilty, against the client's will. [citation omitted] But counsel may and *must* give the client *the benefit of counsel's professional advice on this crucial decision;* and often counsel

---

5. Greenwald's testimony in this regard was:
   Q (by petitioner's counsel) Mr. Greenwald, you knew from Day One, as you tell us, that he wasn't going to plead to anything; correct? A To answer your question, sir, what I knew from the beginning and having practiced criminal law for substantial years, often a client

changes his position in regard to a matter, and though he did express what I have said, it is very possible at any given time he would change his mind for whatever reason. So the answer to your question is I did not know definitely.

can protect the client from disaster only by using a considerable amount of persuasion to convince the client that a plea which the client instinctively disfavors is, in fact, in his or her best interest. This persuasion is most often needed to convince the client that s/he should plead guilty *in a case in which a not guilty plea would be destructive.* § 201 at 339 (the word "must" was emphasized by the author; otherwise, the emphasis is ours)

This manual is a joint project of the American College of Trial Lawyers, the National Defender Project of the National Legal Aid and Defender Association, and the ALI–ABA Committee on Continuing Professional Education. The Reporter, Anthony G. Amsterdam, is a distinguished Professor of Law and Director of Clinical Programs and Trial Advocacy at New York University School of Law.

And finally, in *United States v. Villar,* 416 F.Supp. 887, 889 (S.D.N.Y.1976), Judge Motley—in circumstances quite different from those at bar—made the following observation about effective assistance of counsel:

> Effective assistance of counsel includes counsel's informed opinion as to what pleas should be entered. *Walker v. Caldwell,* 476 F.2d 213, 224 (5th Cir.1973); *Jones v. Cunningham,* 313 F.2d 347 (4th Cir.1963), *cert denied* 375 U.S. 832, 84 S.Ct. 42, 11 L.Ed.2d 63 (1963). As Chief Judge Sobeloff stated in the latter case (at 353):
>
> > Of course, it is not for a lawyer to fabricate defenses, but he does have an affirmative obligation to make suitable inquiry to determine whether valid ones exist. *Such a duty is imposed for the salutary reason that 'prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered.' von Moltke v. Gillies,* 332

U.S. 708, 721, 68 S.Ct. 316, 322, 92 L.Ed. 309 (1948). (emphasis Judge Motley's)

Turning to the facts before us, it would be impossible to imagine a clearer case of a lawyer depriving a client of constitutionally required advice.

█ The second *Strickland* question need not long detain us. Had Greenwald—as he "often [told] drug defendants"—advised his two new clients (petitioner's father, who procured and paid him and petitioner, who signed the retainer agreement) of his professional judgment that it was almost impossible for a "buy and bust" defendant to obtain an acquittal in Orange County (*see* footnote 4, *supra* ), there would have been more than a "reasonable probability" that the father would have organized the family to persuade petitioner not to pursue the suicidal course he seemed bent upon following. Indeed, had Greenwald taken the trouble to learn of the ruinous statements petitioner had made after his arrest,[6] the probability of persuading him to accept the plea bargain would have matured from a "reasonable probability" to a very strong likelihood.

█ With respect to the *Strickland* "strong presumption," the District Judge in explaining his order under appeal gave it serious consideration. He emphasized Greenwald's testimony that he "had frequently discussed the plea offer with [petitioner] during the summer of 1988." This emphasis suggests that the District Judge considered the "strong presumption" as requiring a finding that Greenwald—in the course of these frequent discussions—must have, by implication at least, conveyed to his client his own belief that rejecting the offered plea bargain would be suicidal. However, Greenwald's unequivocal testimony prohibits such a finding. Such testimony did not give much indication of what occurred during these frequent discussions except that Greenwald seems to have kept explaining his planned strategies for winning an acquittal.

---

**6.** As noted in footnote 3, *supra,* Greenwald's affidavit in support of his motion to suppress these statements asserts that he had made appropriate demand on the District Attorney but that the latter had deceitfully denied the existence of any such statements. We find—especially in light of Greenwald's testimony about his contacts with the District Attorney's office (see p. 51 *supra* )— that such assertion is sufficiently improbable to warrant rejection as a matter of law. We do so reject it.

However, it established beyond peradventure that Greenwald never gave his client any advice or suggestion as to how to deal with the People's offered plea bargain.

More importantly, the *Strickland* Court did not intend its "strong presumption" to apply to a case such as this. It made clear that the purpose of the presumption was to protect lawyers from having strategic decisions judged with "the distorting effects of hindsight." 466 U.S. at 689, 104 S.Ct. at 2065.[7] Greenwald was confronted with no strategic decision as to whether or not to give advice to his client. Had there been a reasonable chance of acquittal, petitioner might have been confronted with the strategic decision of whether or not to accept the plea bargain. In no event could Greenwald have been relieved of his constitutional duty to give his "professional advice on this crucial decision."

The fourth question, whether relief is precluded by any state court finding of fact, requires consideration of several circumstances heretofore irrelevant to this opinion.

No state court ever gave solo consideration to the narrow question addressed in this opinion. On the contrary, the above noted hearing before the trial court, which began on February 26 and concluded on March 6, dealt with an "omnibus" motion presenting an apparently wide variety of claims. Petitioner himself testified, claiming—in a manner typical of distraught defendants—all manner of real and imagined grievances. Among other things, he claimed that he had not been informed of the offered plea bargain until after the superseding indictment had been returned. That claim could be—and was—easily refuted by testimony of several witnesses whose credibility could not be questioned. The District Attorney, apparently treating the omnibus motion as a unit,

made an attack on petitioner's credibility, focusing on this particular falsehood. The question of petitioner's reliability might well have been vital to many—if not most—of the questions presented by the omnibus motion. However, it has no bearing on the narrow question with which we are now concerned. *See* Footnote 1, *supra.*

When it came to decision, the trial judge was primarily concerned with a question of no present relevance, namely whether petitioner's statement as to the timing of his knowledge of the possibility of a plea bargain was truthful or false. His opinion does not mention petitioner's constitutional right to be advised whether or not the offered bargain "appear[ed] to be desirable." Similarly, the Appellate Division's affirming opinion addressed a host of issues not here relevant. Its sole finding of fact concerning the claimed inadequacy of counsel was that "[the petitioner] was made aware of a plea offer of 1 to 3 years imprisonment, and told his trial counsel to reject it." *People v. Boria,* 612 N.Y.S.2d 80, 81, 204 A.D.2d 652 (2d. Dept. 1994).[8]

Turning to the question of whether we are precluded, we are faced with an Appellate Division finding of fact which has no present relevance, coupled with a conclusion of law that petitioner had been adequately represented by counsel. The District Attorney notes in his brief, at p. 8, citing *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2065 and *Winkler v. Keane,* 7 F.3d 304, 308 (2d. Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994), that conclusions of law require *de novo* review. As we have seen, such review can lead to only one conclusion.

This leaves the question of what remedy should result from our ruling. In denying petitioner's motion to vacate the judgment, the trial judge suggested that the remedy petitioner sought, namely to be put

---

7. The *Strickland* Court was dealing with a capital case in which it was contended that the defendant's lawyer should have—in the sentencing phase of the case—provided the trial judge with concededly helpful character-type evidence. The lawyer's strategic reason for withholding such evidence was fear that—in light of expected cross-examination and rebuttal—it would do more harm than good.

8. Leave to appeal to the Court of Appeals was denied by Honorable George Bundy Smith. 83 N.Y.2d 1002, 640 N.E.2d 151, 616 N.Y.S.2d 483 (1994). The Court itself was in no way involved, leaving the Appellate Division as the highest New York court to have ruled on the matter before us. See N.Y.Crim. Proc. Law § 460.20 (McKinney 1994).

back in a position of being able to plead to the lesser indictment, was procedurally impossible. Whether or not such relief would then have been possible, it would not now be appropriate. There could now be no assurance that witnesses necessary for prosecution would be available should a trial be required. Furthermore, there is no claim before us on this appeal that the trial was affected by constitutional (or indeed any) error. Accordingly, petitioner having already served six years in prison—at least twice as long as would have been possible had he accepted the offered plea bargain—we shall order that the sentence be reduced to time served and that the petitioner be discharged, but the judgment of conviction will not be disturbed.

## CONCLUSION

For the above stated reasons, we vacate the order appealed from, and remand to the District Court for entry of an order granting the petition and directing that the petitioner be discharged.